I'm here today on behalf of the appellant, in this case, Domingo A. Lopez, who I will refer to in my presentation as Dr. Lopez. This is an appeal from a tax court decision sustaining negligence penalties under IRC sections 6652 and 6661. What's our standard of review? Standard of review is for clear error and whether the court determines that there has been a mistake made or a miscarriage of justice, which I believe in this case there was a miscarriage of justice. Well, the clear error is a pretty high standard. Why is what the tax court found impermissible? I'm sorry, Your Honor? I said it's a – the standard of review means that you have a pretty high hurdle. Yes. So what specifically did the tax court find that it was not entitled to find? And that's the core of my argument, Your Honor. Specifically, the tax court concluded that the licensing agreement in this case canceled out the R&D agreement, thereby rendering the investment by Dr. Lopez basically unreasonable. In other words, what happened was that Dr. Lopez received an offering memorandum. He took it to his attorney. His attorney reviewed it, advised him that the investment was substantively correct as far as tax matters go. Dr. Lopez made the investment. And the tax court specifically held that the licensing agreement canceled out the R&D agreement and that any experienced lawyer capable of reading and understanding the subject documents should have understood the legal ramifications of the one versus the other. The error that the tax court committed was that it assumed that the offering could be read in such a way to know that the licensing agreement was going to be signed at the same time that the R&D agreement was going to be signed. That was not what the offering contemplated at all. The R&D partnership had been set up originally to fund – the partnership was set up originally to fund R&D from a corporation that was an unrelated entity. When the R&D was successful, the partnership had an option to exercise a licensing agreement with the R&D or to not exercise it. They would be the owners of the proprietary information and would give 15 percent royalty over to the R&D people. What the tax court's decision is assuming is that Dr. Lopez or anybody who was reading this offering, Circular, could have understood that the general partner in this case would give away the deduction for the R&D expense by signing the licensing agreement within a week of when he signed the R&D agreement. The licensing agreement basically canceled the R&D agreement by its very terms. Nobody reading the Circular could have imagined that the general partner would do something that was so adverse to the business interests of the partnership. But it was pretty clear from all of the documentation that these folks had no experience. It was clear that there were no guarantees of tax benefits. And even the lawyer testified that his review was not an endorsement. The endorsement reference was, I believe, a reference more to the economics of the transaction rather than to the tax consequences of the transaction. The problem with the R&D deduction, first of all, in an offering, Circular, by its very nature, it's a piece of paper. It's always subject to subsequent events. The money is going to be spent, but you never know in advance whether those expenses are going to be properly characterized as R&D or as something else. So there's always a risk involved. The offering Circular in this case is 100 pages long. It's written by attorneys for attorneys. It provides cover for the promoters. And that's the very nature of these types of limited partnerships. Where I think the tax court decision is extremely unfair is that it basically attributes to Dr. Lopez information and knowledge about what was happening between the R&D partnership and the licensing that he had no way of knowing. And that attribution, I think, is extremely unfair. The other thing the tax court decision, I think, is clearly erroneous about is it goes on to say, well, not only does the offering Circular say, you know, such and such, but you can't even depend on the terms of the offering Circular. You must go out and conduct your own independent survey, independent study of the market, of, you know, who's going to buy these beans, who's going to produce them. That's a standard of care that is far beyond anything that's in any of the other cases, you know, cited. This case, in fact, is almost directly on point with Cantor. Cantor, however, I would note, is a pre-TEFRA case, a 1981 tax case. They got their case heard within a reasonable period of time. Dr. Lopez had to wait until the underlying tax case was over before he could litigate his issue about negligence. And that was because the general partner dragged the matter on for a very long period of time. By virtue of that happening, it made it very difficult to the testimony of the record, I think, in this case, it's very difficult, simply because it's been 20 years. Dr. Lopez. But it's still the taxpayer's burden. It is. I agree with that totally, Your Honor. Dr. Lopez was in his early 40s when he made the investment, and he was in his early 60s when he testified at trial. What I do think the tax court decision does say, though, pages 3 and 4 of the decision, I think, correctly state that Dr. Lopez got the offering circular, he passed it on to his tax advisor, and his tax advisors allowed him to make the investment. I think that's a true and accurate statement of the facts. Also, I believe Dr. Lopez testified he spent 25 hours considering this investment. It was not instantaneous or an impulse buy, so to speak. He took many steps to assure himself that the deductions were legitimate. There was an issue among the warning signs that the government tries to point out is that this investment was leveraged with a promissory note, that that somehow, you know, should have been a warning sign to him. Dr. Lopez took that warning or took that promissory note very seriously. He made the first payment under that note. They called for annual payments. So he did not just take the deductions and then walk away. He continued to participate in the partnership and make his share of the promissory note. I think that the issue in this case is what did Dr. Lopez know and what should he have known in order to be able to exercise reasonable and due care in claiming the losses. What he should have known was what was contained in the offering circular. What was represented to him by Mr. Moore, the agent who sold him the investment. What he could not have known was that the general partner would have given away the technology in this case by signing the licensing agreement, thereby terminating the R&D agreement at the same time that he signed. Yes, Your Honor. That is correct, Your Honor. That's what I referred to earlier about the leverage in the promissory note. Well, no, Your Honor, because the promissory note was to be paid, the interest payments were to be paid by the taxpayer, which he did make payments. And then subsequently the note was to be satisfied out of the income generated from the partnership. I'm sorry, Your Honor. I'm sorry, I can't understand. If there was any income generated, there may have not been any income generated. No, no income was generated in this case, Your Honor. And I would concede that when you read the Reid case in the substantive issue, the Utah Jojoba case, it's astonishing that the behavior of the general partner in this case. I totally agree with that. I don't think they put on a very good case at all. But was there any research done at all? Well, Your Honor, the research was supposed to be done by the individuals who were enumerated in the offerings circular. There was a Ph.D. and some scientists who had written some articles on the genetic engineering and biotechnology of Jojoba plants. It had something to do with hardening the net to make it more. Answer to her question, no. There was none done by Dr. Lopez. Absolutely. I mean, aside from the fact that he's a. . . By this partnership. Well, aside from the fact that he is a dermatologist and familiar. . . Not that partnered. By going into something that was supposed to be producing research. Is that research? No. Well, Dr. Lopez was familiar with the Jojoba. . . That's not the question. Did the entity in which he invested do any research or not? It did not. It hired, contracted out. But those are the precise facts of Cantor. And the precise facts of Cantor was that there was a limited partnership. They hired someone to do computer development. And the partnership itself did not conduct any trade or business. And the losses were disallowed. But the court said, yeah, but no negligence here because the law was unsettled as to this point. So the Cantor case actually is a little bit worse for the taxpayers than the Lopez case for the following reason. In the Cantor case, the licensing agreement was signed prior to the R&D actually being done. And it appears as if the limited partners knew that going in. Whereas in our case, we, Dr. Lopez had no idea that that was signed in advance. Counsel, you have about two minutes and a little bit left. I'm going to reserve my time. Thank you very much, Your Honor. We will hear from the government. Thank you. May it please the Court. I'm Frank Styler representing the Commissioner. Judge Hunt, can you hear me all right? Just barely. I'll try to speak louder. Is that better? That's better. The first point I'd like to make is that until this moment, I hadn't realized there was any issue about the tax court's finding or reading of the offering circular in providing that the licensing agreement terminated the R&D agreement. That has not been an issue before, so I'm pressed to go back and find or actually respond to that argument. The contention, as I've read the briefs, was that Dr. Lopez understood this to be an all-right investment, et cetera, not that there was any issue about the finding that the R&D agreement was window dressing. Indeed, that's what makes one of the things that makes this distinguishable from the Cantor situation. Cantor ultimately became the issue of whether the partnership was in a trade or a business and whether in the state of the law at that time you had to be in a trade or business, et cetera, and the law was unsettled. What wasn't unsettled was the fact you had to be involved directly or indirectly in research and experimental activities. That was clear. That was not clear in this case because, as the Court found, the partnership never engaged in R&D because the R&D agreement it had with U.S. AGRA, the party that was to conduct the research and development, was extinguished as soon as the licensing agreement was issued. So, in effect, all you had was the money from the investors being advanced as capital contributions for the farming of Jojoba. There was never any basis for claiming the 174 deduction. And the point the task court made was that if you read the offering circular, if anyone read it carefully, that that would have been obvious that there was no basis for claiming an R&D deduction. Now, for the first time this morning, I'm told, no, the Court was wrong. It all depended upon the signing of the two agreements and the partnership agreement, et cetera. As I said, that is not here to form an issue on appeal, and I'm pressed to have an opportunity to respond effectively to that. I think we have to take the task court's finding in that regard and reading and go with it. But beyond that, the question becomes what type of diligence, if any, was exercised by Dr. Lopez in entering upon the investment? And let me – and in that regard, the question was whether he acted reasonably and prudently in approaching the investment. The record is devoid of any indication that he did any research, contacted any independent expert or anyone with knowledge of the industry. Opposing counsel makes the point that it should be enough for an investor to talk to a lawyer who knows something about taxation, and that he did that, and that that in and of itself is enough to be prudent. What's your response to that? Well, there are two responses. One, that is not – that may be taken into account and may be a defense. It's not an absolute defense, number one. Number two, there has to be evidence of what that advice was. There's no evidence of what the advice was that was given to Mr. – sorry, Dr. Lopez. And the advisor here was Mr. McDevitt. I mean, the tax advisor we're talking about is Mr. McDevitt, who testified below and testified that he didn't endorse the investment. Specifically, what advice he gave, we don't know. We don't know. And the point is, the – had he – it is also clear from the record that Dr. Lopez had no reason to believe that Mr. McDevitt knew anything about HOHOBA research. I don't think it's simply sufficient. Well, does the person have to know about the specifics of the kind of research, or do they only have to know about taxes? Primarily taxes. And I think anyone looking at that, I guess, comes back to this first point about the 174 claim, is that – They would be expected to know that you have to actually have research and development. Yes. But they wouldn't necessarily have to understand the research, I would assume. I think that's right. I would agree with that. I would agree with that. And I think the point here was there – we don't know what advice was given. We just have Mr. McDevitt's statement below that he didn't endorse the investment. Whatever he said is just not in the record. And if you look at what the tax court found to be the situation here, there was no R&D agreement. There was no research and experimental expenditures made. And there was a witness that the commissioner put on testifying about the actual work conducted by U.S. Agri and concluded that it was not doing – it did nothing other than farm. There really was no R&D taking place at all. Now, was this something that the tax advisor should have known? Well, when you say tax advisor, you're talking about the lawyer or the – well, somebody should have. I mean, it's one thing for a client to come to a tax lawyer or tax advisor and say, is this deductible on this set of facts, and review the law. And presumably the advisor may not know anything about HOBA, but presumably would suggest that he seek – that the client seek some independent – have some independent basis for believing one could make money from such an investment. But beyond that, would properly confine himself to the tax law. You know, on this set of facts, on these assumptions, I conclude that this is or is not deductible. And that's all you need. But somewhere along the way, whether it be the tax advisor or otherwise, Dr. Lopez, if he was reasonably prudent about the investment, should have done something, either library research, contacted some disinterested parties who knew something about agriculture, perhaps contacting a state college or university with an agricultural program, perhaps contacting the U.S. VA, the local – Well, I think that's right. I think the bottom line here is this was a shelter. I think if you read the record, what it comes down to is he was looking to get tax deductions, and how he got them was more or less secondary. And the promoters didn't offer any lawyers a statement on the tax deductibility of these items. I'm sorry. I think that the promoters did not include in their offering any statements from their tax lawyers or independent tax lawyers as to the likelihood of a deductibility of these investments. They have, as I recall, a number of warning statements. I don't recall if they had included in the circular an opinion of counsel. As I stand here, I just don't recall if that was in the record in the circular. I do know that the circular contained all sorts of cautionary statements, as the private placement memoranda did back in this era, that the service was aggressively auditing shelters, and there may be questions about this. And I think they had the usual statement about consulting with your own tax advisor. Now, as I get your argument here recently, there was supposed to be R&D going on, according to the circular. There was, in fact, no R&D going on, and the taxpayer didn't discover that. Now, as I understand your argument, that alone would be fatal to the claim, to the deduction. Well, not only didn't discover it, but the fact, as far as 174 is concerned, that the agreements were structured in such a way that there could be no R&D deduction, because even if U.S. AGRA conducted R&D, the agreement between the partnership and U.S. AGRA was extinguished with the execution of the licensing agreement. So any R&D that would have been conducted thereafter would not have in any way inured to the partnership. But that's the more, I suppose, the threshold issue, though, is whether going into this, putting aside the question of the 174 deductibility, there was reasonable due diligence on Dr. Lopez's part in terms of trying to ascertain whether or not this was viable, was I going to be able to make money from this investment? Would there be a market for these products if we could develop them? What kind of products might be developed? There's absolutely no evidence on the record that anything like that was done, other than the fact he talked to some of his doctor colleagues and said it was a good investment. He may have talked to his family. He talked to Mr. Moore, who was, in effect, a promoter, who had no experience with this type of research. He had some sort of conversation with Mr. McDevitt, but, again, no indication that Mr. McDevitt had any experience with this type of product or investment. So in terms of the due diligence that should be required of a reasonably prudent investor to claim a deduction in the first place of any kind, the record is devoid of any such activity on the part of Dr. Lopez. I thought I was getting that one basic problem was that it was an R&D contract. There was no R&D. He didn't discover that. He loses. Now, that's a pretty clear black-letter ruling, if that's true. Well, it is as far as the R&D is concerned. I'm putting a somewhat larger picture. But focusing on 174, I think even to a layman, reading the agreements, which provided that the R&D agreement was to be extinguished with the licensing agreement, and, in fact, this all happened simultaneously, certainly even to an intelligent layman there should have been a serious question about, how in the world can I be claiming a deduction for R&D expenses? And there's no indication that there was any thorough review of the circular. Dr. Lopez admitted that he looked at it, didn't fully understand it. There's no indication that he had any no evidence that he had any in-depth discussion about it with Mr. McDevitt or anyone else. So the question becomes, did he have a basis for claiming this deduction? More specifically, the question is whether he carried his burden of proof to demonstrate it. Well, I think he certainly didn't, because I don't think there's evidence of anything I want to call due diligence in the record. I would also note that there are two sets of penalties here, the 6653 negligence penalties and the 6661 understatement penalty. And there's been no attempt made to challenge or question the imposition of the substantial understatement penalty, which would require a showing that there was authority for the position taken on the return, but that showing wasn't made either below or in the briefs. So what we're talking about here are the 6653 penalties. I think with that, unless the Court has further questions. Judge Hall? No further questions. Okay. Thank you. Thank you. You have a very brief amount of time remaining for rebuttal. Thank you, Your Honor. On the point about tax advice, I think it's exactly right. Under the Boyle v. U.S., Dr. Lopez did seek competent tax advice. I agree that the record is not the best with respect to saying exactly what that advice was, but the reason for that had to do with the long stretch period of time. But the tax court decision does say that the circular was given to Mr. McDevitt, Mr. McDevitt reviewed it and talked it over with Dr. Lopez. Dr. Lopez in the record, not cited by the Court, but in the record said he understood that Mr. McDevitt gave him the go-ahead. So that seems to me to be the substance of the advice that he received. In a deal like this, a limited partner by his very nature is a passive partner. I'm not sure what his duty is to go out and research and do market studies and go to universities and things of that sort. I think that's what he's depending upon the partnership to do. Well, but in a more basic sense, is he not at least obliged to find out if there is any research, not the nature of it and whether it's great research or bad research, but there wasn't any research here and wasn't he obliged to find out? But the circular does go on for about four or five pages describing the microbiology and the genetic engineering and these doctors had written these great articles and there was all this money to be had by, you know, reengineering and hardening the nut and this sort of thing. And that's what Dr. Lopez expected was going to happen, that there was a HOVA farm, they were going to conduct research, they were going to come up with this new technology, and they were going to make money. And with respect to making money, Dr. Lopez was very clear this was not a tax write-off. The tax write-off was a factor, but it was not a tax write-off. He honestly believed that this thing could make money. And being a dermatologist, he was attracted to the idea of using a HOVA because he knew the commercial application of a HOVA. Just one other point. The question in this case is not the deduction, but the negligence. The question isn't was it deductible. Utah HOVA, they got slaughtered. They were not even close to sustaining the deduction. The issue in this case is what did Dr. Lopez do? Was he playing fast and loose with the tax rules, claiming deductions he knew he shouldn't have been entitled to? Or did he provide a certain degree of credibility to checking it out, making sure it was legit? When he found out it wasn't legit, he took his lumps, paid his tax and went on. And that's the issue. You have exceeded your time. Thank you. I think we understand your position. Thank you. Lopez v. Commissioner is submitted. And we thank both counsel for their arguments. Our final case on the morning calendar is Borg v. White.
judges: Hall, Tg Nelson, Graber